IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| BRITTNEY COLEMAN, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CASE NO.: 1:14-CV-168 (WLS) |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## BENCH OPINION

This civil case is before the Court for findings of fact and conclusions of law following a bench trial.

### I.  PROCEDURAL BACKGROUND

Plaintiffs, Brittany Coleman and Gerald Davis, individually and as the natural parents of J.D.[1],timely filed a complaint against the United States of America under the Federal Tort Claims Act (hereinafter "FTCA") on November 5, 2014. (Doc. 1.) Plaintiffs allege that as a result of Dr. Ese Efemini and Nurse Midwife Elois Edge's negligence, J.D. suffered severe and permanent disabling injuries. All parties agree that during the acts alleged by Plaintiffs, both Dr. Efemini and Nurse Edge were acting as agents of the United States of America.

The Court held a bench trial in this case on January 21, 22, and 23, 2016, and allowed the parties to submit evidence, testimony, and written arguments. At the request of the parties, the Court allowed for leave to depose Dr. Craig H. Lichtblau and Dr. Ese Efemini after the bench trial concluded. (Doc. 13.) Having reviewed the evidence and briefs in their entirety, the Court makes the following findings of fact and conclusions of law.

### II. FACTUAL FINDINGS

Plaintiff Brittany Coleman arrived at Mirian Worthy Women's Health Center (hereinafter referred to as "Women's Center"), doubly known as Albany Area Primary Healthcare, on September 20, 2011 after she received a positive result during a home health pregnancy test.

---

[1] For the purposes of privacy, J.D. will be used throughout the course of this Order to refer to the injured minor in this case.

(Doc. 25-1 at 22.) All parties acknowledge that Defendant, the United States of America, was responsible for all agents or employees of the Women's Center. At the time Coleman arrived at the Women's Center on September 20, 2011, Coleman had given birth vaginally three times prior. Two of Coleman's three prior vaginal births, in September 2007 and October 2009, involved shoulder dystocia. Shoulder dystocia occurs when an infant's shoulders become wedged against the mother's pelvis during birth, preventing proper passage through the birth canal. (*See* Doc. 25-36.) Shoulder dystocia can result in significant damage to infants, including a brachial plexus injury, fracture of the clavicle, hypoxia, or death. (*Id.*)

For Coleman's first three pregnancies, in 2002, 2007, and 2008, Nurse Edge served as Coleman's nurse midwife. Coleman gave birth to her first child who was six pounds, nine ounces in December of 2002 during her 42nd week of pregnancy. Coleman's first pregnancy was without complication. During her pregnancy in 2002, Coleman gained 30 pounds. Coleman gave birth to her second child who was 7 pounds, 2.4 ounces in September 2007 during her 40th week of pregnancy. Coleman's second pregnancy was complicated by shoulder dystocia. Coleman gained 40 pounds during that pregnancy. As a result of Coleman's 2007 pregnancy being complicated by shoulder dystocia, a McRoberts maneuver was performed during labor. A McRoberts maneuver involves pulling a mother's legs back towards her abdomen. If the McRoberts maneuver is unsuccessful alone to deliver an infant, often suprapubic pressure is applied on the area where an infant's shoulder is wedged against a mother's pelvis while the McRoberts maneuver is applied. Coleman gave birth to her third child who was seven pounds and 10 ounces in October of 2009 during her 39th week of pregnancy. Like her second pregnancy, Coleman's third pregnancy was complicated by shoulder dystocia as well. Coleman gained 40 to 50 pounds during her third pregnancy. The McRoberts maneuver was again applied to deliver Coleman's third child. Nurse Edge did not inform Coleman that her second and third deliveries were complicated by shoulder dystocia.

Nurse Edge also served as Coleman's nurse midwife during her fourth pregnancy, the pregnancy at issue in this case. Over the course of Coleman's many visits to the Women's Center during the course of her fourth pregnancy, neither Nurse Edge nor any other employee of the Women's Center counseled or alerted Coleman of her prior history of

shoulder dystocia. (Docs. 21-1, 21-2.) Coleman's doctor who delivered J.D., Dr. Efemini, was not aware prior to J.D.'s delivery of Coleman's past shoulder dystocia complications. Dr. Efemini did not record any conversation with Coleman regarding alternatives to vaginal birth such as a cesarean section.

On April 20, 2012, Coleman arrived at Phoebe Putney Memorial Hospital. Since Coleman's pregnancy had reached 40 weeks and five days and the size of her fetus was larger than expected, Coleman's labor was induced. (Doc. 25-8.) To induce labor, both Cervidil and Pitocin were used. On April, 21, 2012, Coleman went into labor. After noticing that Coleman's infant's fetal heart rate was low, the medical staff determined that a vacuum extractor was necessary to deliver the baby faster. Once J.D.'s head was delivered, Dr. Efemini recognized pregnancy complications caused by shoulder dystocia. To resolve these complications, Dr. Efemini applied the McRoberts maneuver, and then Nurse Edge applied suprapubic pressure. After three pulls on J.D.'s head, according to Nurse Edge, J.D. was delivered. (Doc. 19 at 143.) Following delivery, J.D. could not move her left arm. Upon J.D.'s discharge from the hospital, it was noted "[t]his is a term infant with brachial plexus palsy due to a difficult vaginal delivery." (Doc. 25-13 at 5.) On October 3, 2012, only a few months after J.D's birth, an MRI exam identified injuries to the C6, C7, and T1 nerve roots and other damage consistent with a brachial plexus injury.

Attempts to resolve J.D.'s injuries by physical therapy were unsuccessful. It was determined that surgery was necessary to attempt to correct J.D.'s injuries. On November 20, 2012, J.D underwent a thirteen-hour brachial plexus neuroplasty. Less than two years later, on May 20, 2014, J.D. underwent a second surgery to resolve injuries to her left clavicle. Close to a year after J.D.'s second surgery, on June 23, 2015, J.D. underwent a third surgery to resolve many of the injuries that were present since the time of her birth. According to J.D.'s doctor, Dr. Mujadzic, it is likely J.D. has reached her maximum medical improvement. (Doc. 23-1 at 47.)   Dr. Mujadzic believes further surgery would not be beneficial. (*Id.*.) J.D.'s range of motion in her left arm, the arm injured during birth, is limited. J.D.'s disability has had an impact on her family as well. Coleman, J.D.'s mother,

notes that she is "afraid to leave" J.D. and has been much more stressed since J.D.'s birth. (Doc. 20 at 55-56.)

Plaintiffs argue J.D.'s injuries and the subsequent impact of J.D's injuries are directly a result of Dr. Efemini and Nurse Edge's neglect in their capacity as agents of the United States of America.

## III.   DISCUSSION

Prior to the Court's assessment of whether the United States is liable for J.D.'s injuries, the Court deems it necessary to address the United States' assertion that Plaintiff's negligence claim relies on an informed consent theory. In the view of the Court, the United States wrongly represents Plaintiffs' argument and attempts to conflate the primary question before the Court with a question, that as alleged by Plaintiffs, is not central to a determination of liability—informed consent. Under Georgia common law, there is no general requirement for physicians to disclose with the exceptions of those noted by statute under O.C.G.A § 31-9-6.1(a). *Albany Urology Clinic, P.C. v. Cleveland*, 528 S.E.2d 777, 780 (Ga. 2000). Although there was no requirement for Dr. Efemini, Nurse Edge, or other employees of the United States to *per se* provide informed consent, that does not bar or preclude a finding that the United States is liable based on a review of the allegations within the Plaintiffs' Complaint read as a whole. (Doc. 1.) As such, the Court will turn to Plaintiff's personal injury claims against United States.

The FTCA waives the United States' sovereign immunity for torts of government employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). In Georgia, where the United States' alleged act or omission occurred, "[a] person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." O.C.G.A § 51-1-27. A plaintiff suing for medical malpractice must establish (1) the doctor's duty to the patient, (2) the breach of that duty through the failure to exercise the requisite skill and care, (3) and an injury proximately caused by the failure.

*Haughton v. Canning*, 287 Ga. App. 28, 28 (2007). Georgia courts presume that physicians, nurses, and other medical professionals exercise due care in skill and treatment. *Beach v. Lipham*, 276 Ga. 302, 304 (2003). To overcome the presumption made by Georgia courts, the plaintiff typically must present expert medical witnesses. *Id.* Furthermore, "an expert's opinion on the issue of whether the defendant's alleged negligence caused the plaintiff's injury cannot be based on speculation or mere possibility. It must be based on reasonable medical probability or reasonable medical certainty." *Zwiren v. Thompson*, 276 Ga. 498, 503–04 (2003).

### A. Liability

After assessing the evidence presented in its totality, the Court concludes that Plaintiffs have established, by a preponderance of the evidence, that agents for the United States violated the requisite duty of skill and care. The Court further finds there is a reasonable medical probability that the United States' actions and omissions were the proximate cause of J.D.'s injuries.

### 1. Duty of Care

Both Dr. Efemini and Nurse Edge, agents of the United States, owed a duty of care to Plaintiffs. The United States does not dispute that shoulder dystocia can be one of the most frightening complications encountered during pregnancy. (Doc. 25-36.) The United States had a duty of care during Coleman's fourth pregnancy with J.D. to: (1) evaluate Coleman's medical background and then relay the information to the appropriate parties; (2) consider the appropriate approach to Coleman's fourth pregnancy given her two prior instances of shoulder dystocia; and (3) use appropriate maneuvers when made aware of complications resulting from shoulder dystocia.

Coleman's medical records from 2007 (Doc. 25-23) and 2009 (Doc. 25-24) were available prior to Coleman's fourth pregnancy with J.D. Dr. Elizabeth Howard, an expert in nursing and midwifery, noted during trial that "a review of relevant history," a collection of all data, and then a decision thereafter as to whether or not to consult with an obstetrician is a fundamental part of a nurse midwife's duties. (Doc. 19 at 27-28; *See also* Doc. 25-36.) Dr. Howard further stated that when a mother is nine months pregnant and presents to the

hospital, a nurse midwife should revisit the obstetric history including hospital records; reevaluate the size of the fetus and the size of the mother's pelvis; and consult with the attending obstetrician. (Doc. 19 at 32.) This is particularly the case where there is a past history of shoulder dystocia. Dr. Steven Pliskow, an expert as well, echoed Dr. Howard's statements that, at a minimum, documentation of a prior shoulder dystocia must be acknowledged so it can be addressed in the future. (Doc. 20 at 80-81, 88.)

Dr. Pliskow also noted that if there is a prior shoulder dystocia, a physician should be aware that there is a "ten times higher risk in future pregnancies of having a shoulder dystocia the next time." (*Id.*) At the time of Coleman's fourth pregnancy, several others agreed with Dr. Pliskow's position that a prior shoulder dystocia could suggest a reoccurrence of that complication in future pregnancies.[2] (Doc. 25-37 at 1)("Prior shoulder dystocia is considered a risk for recurrent shoulder dystocia."). Considering the then-available resources on the potential reoccurrence of shoulder dystocia, physicians and nurse midwives should have had knowledge of a mother's prior medical history. Dr. Pliskow notes that nurse midwives and physicians aware of past instances of shoulder dystocia often perform a cesarean section to prevent potential complications during future pregnancies. (Doc. 20 at 81.)

As it relates to the pregnancy itself, prior to any induction of pregnancy, an estimated fetal weight is necessary. When shoulder dystocia becomes apparent during labor, Dr. Pliskow notes that "finesse and not force" is most important. (*Id.* at 92.) As a general matter, induction of labor when shoulder dystocia is apparent is discouraged.  If confronted with shoulder dystocia during labor, the first maneuver to be performed by a physician is the McRoberts position. Suprapubic pressure is then added if necessary. If the McRoberts maneuver and suprapubic pressure are unsuccessful in delivering a baby, Dr. Pliskow advises that physicians should then rely on various rotational maneuvers that "are designed to move that shoulder out from under the pubic bone with your fingers, to the oblique, to the diagonal where there's more room to [deliver] the child without the impaction of the

---

[2] Plaintiffs' objection to the United States' Exhibit 1, an ACOG Practice Bulletin dated November 2015, is hereby **SUSTAINED**. An assessment of the proper standard of care for Coleman's fourth pregnancy, taking place in 2012, would not include a report written in November 2015.

shoulder on the pubic bone." (Doc. 20 at 93.) After considering the record as a whole as presented, the Court finds that both the evidence and expert testimony aforementioned has established the adequate standard of care. Both Dr. Howard and Dr. Pliskow emphasize that medical professionals should be aware of a mother's medical history and take necessary precautions to avoid shoulder dystocia. (*See* Doc. 19 at 47-75; Doc. 20 at 80-102)

### 2.  Breach of Duty of Care

Nurse Edge and Dr. Efemini breached their duty of care to Coleman and J.D. The evidentiary history of this case reveals an ongoing failure by the United States' agents to meet the expected standard of care for similarly situated medical professionals. Neither Nurse Edge nor Dr. Efemini reviewed Coleman's medical history. Nurse Edge was actually present during Coleman's two prior shoulder dystocia complications but did not remember that either pregnancy was complicated by shoulder dystocia. This is notwithstanding the fact she previously documented Coleman's relevant medical history herself. Nurse Edge then failed to review Coleman's documented past medical history, which she wrote herself. Dr. Efemini also erred by failing to review or ask for Coleman's medical history. It is remarkable to the Court that Nurse Edge, Dr. Efemini, and all other relevant agents for the United States failed to review Coleman's relevant past medical history. The onus was on the United States' agents, not Coleman, to fully review Coleman's medical history and act within the acceptable standard for medical professionals thereafter.

Nurse Edge and Dr. Efemini's failure to evaluate Coleman's prior medical history prevented a timely, thoughtful and effective professional appraisal of how to handle Coleman's pregnancy and labor. Dr. Efemini acknowledges he would have preferred an opportunity to review Coleman's medical history prior to entering the labor and delivery room. Without available information of past shoulder dystocia complications, medical professionals cannot make appropriate medical care decisions in the safest and most appropriate manner. There were several missed opportunities to take preventative measures prior to induction of Coleman's fourth pregnancy and labor. When Coleman arrived in April 2012, prior to her pregnancy being induced, her medical history could have been reviewed. A reasonable medical practitioner in Nurse Edge's situation also would have assessed the

weight of the fetus, accumulated other necessary vitals, and then informed an obstetrician accordingly.

Nurse Edge and Dr. Efemini failed to respond to Coleman's shoulder dystocia with the requisite standard of care as well. Although there was concern about J.D.'s fetal heart rate prior to the identification of Coleman's shoulder dystocia, J.D.'s fetal weight should have been determined first. Granted, Nurse Edge and Dr. Efemini used the McRoberts maneuver and suprapubic pressure. That was the correct initial response. However, there is a reasonable medical probability that Dr. Efemini and Nurse Edge did not act in accordance with the requisite standard of care after the McRoberts maneuver and suprapubic pressure application were unsuccessful. Dr. Efemini and Nurse Edge pulled on J.D.'s head three times during Coleman's labor. This practice deviated from any appropriate standard of care presented to the Court. If the McRoberts maneuver and application of suprapubic pressure were unsuccessful, rotational maneuvers should have been applied. In sum, the United States deviated from the accepted and established standard of care at several different critical points during Coleman's delivery of J.D.

### 3. Causation

The Court concludes that there is a reasonable medical probability that Nurse Edge and Dr. Efemini mishandled Coleman's pregnancy and J.D.'s birth. As a result, the United States's conduct, in view of the applicable standard of care, was the proximate cause of J.D.'s injuries. If Nurse Edge or Dr. Efemini had timely and properly reviewed Coleman's prior medical history, a cesarean section would have been identified as the safest manner to deliver J.D. Dr. Efemini admits as much. (Doc. 24-1 at 71:6-71:12 (noting that for a woman who has had two prior deliveries complicated by shoulder dystocia that "a C-section will be the safest").) At any juncture, even up to the point Coleman presented in 2012, J.D's brachial plexus injury could have been avoided if an adequate review of her medical history had taken place. Unfortunately for J.D. and her family, no such precautions were taken by the United States' agents. Even after recognizing complications due to shoulder dystocia, there is a reasonable medical probability that Dr. Efemini failed to employ the appropriate medical procedures necessary for a safe and successful birth. The United States offers no evidence to

refute the evidence of negligence before the Court. After an evaluation of voluminous record, the Court finds that Nurse Edge and Dr. Efemini's actions and omissions, agents of the United States, caused J.D.'s injuries with a reasonable degree of medical certainty.

### B. Damages

Georgia law permits a plaintiff in a personal injury suit to recover general and special damages resulting from a defendant's tortious conduct. O.C.G.A. § 51-12-2, *et seq*. District courts have a great deal of discretion in determining damages in a bench trial. *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999). Although J.D.'s injuries are significant, the Court is optimistic about J.D.'s future. The Court's optimism is tempered by reality, however. The Court recognizes many of the difficulties J.D. might face. These difficulties should not prevent J.D. from living a full and enjoyable life, however. As such, the Court believes the following damages are adequate and justified in light of the realities Plaintiffs might confront.

### 1. Special Damages

Unlike general damages, special damages must be proved in order to be recovered. O.C.G.A. § 51-12-2. The Court's analysis here relies on the evidence provided by experts and the record as a whole. As a preliminary matter, the Court decided to assess J.D.'s life expectancy based on the showing that she has a minimum of a 25 percent chance of living longer than 88 years. J.D.'s life expectancy is an average of the life expectancy tables presented to the Court from 1949 and 2010. (*See* Docs. 11; 25-41; 25-42; 25-60.) The Court also views J.D. as capable of, at a minimum, receiving her bachelor's degree. The Court will address J.D.'s special damages in three parts. First, the Court will address J.D.'s future life care plan as an adult. Second, the Court will address what lost wages J.D. is entitled to. Last, the Court will address what the appropriate measure for loss of household production will be for J.D.

### a. Life Care Plan

The Court agrees with Dr. Licthblau and Mr. Gingras that an appropriate life care plan for J.D. must consider the need for continual services. (Docs. 11-5; 22-1; 27-1.) J.D. likely will need a variety of services throughout the course of her life to ensure she is afforded as

near a normal lifestyle as possible. Some of the aspects included in J.D.'s life care plan will include physical medicine treatments 24 times a year starting during her adulthood, trigger point injections 1 to 3 times a year, and several epidural injections all beginning when she is in her forties or fifties. (Doc. 27-1 at 22.) J.D. will also have to participate in occupational therapy and visit with a physiatrist at a minimum of once a year after she becomes 16 years old including other annual services. (*Id.* at 21.) This is in addition to other recurrent expenses for a telephone holder, toothpaste dispenser, lace locks, and other equipment J.D. will need assistance on a day-to-day basis. (*Id.* at 23.)  To properly compensate J.D. for expenses she will need throughout the course of her life, the Court finds damages totaling **$2,682,618** appropriate and reasonable. This amount takes into consideration that J.D.'s ailments could become more problematic over the course of time and require greater medical attention and treatment.

### b.  Lost Wages

The Court believes J.D. can become an active participant in the work force. J.D.'s disability will not foreclose all job opportunities when J.D. is old enough to enter the workforce. Based on the evidence provided to the Court, the Court believes it is possible that J.D. will have obtained her bachelor's degree, be gainfully employed, and earn the median amount for individuals with a bachelor's degree. (Docs. 11; 11-5; 25-33.) However, given difficulties that could worsen over the course of time, the Court does believe that J.D.'s earning potential might be limited by 20 percent. (Doc. 25-33 at 21.) As a consequence, based on the testimony of Plaintiff's expert Mr. J.P. Gingras, the Court finds that lost wage damages totaling **$471,047** are appropriate and reasonable.[3]

### c.  Lost Household Production

Plaintiffs also have moved the Court for damages attributable to loss of household production. Examples relied upon by Plaintiffs are home maintenance and repairs,

---

[3] As an aside, the Court notes that the young woman the Court met has the potential to far exceed a bachelor's degree and appears capable of accomplishing whatever she sets her mind to limited only by the physical limitations to her left arm. The Court would be careless in analyzing this case or J.D.'s special damages if it did not make clear that beyond any monetary damages she might receive, J.D. should approach life with a fervent zest. Her disabilities are a reality and might in some situations be a limitation, but should never define her. There are vast areas available to her, unaffected by her physical disability. The Court encourages J.D. to take note of the words of Hellen Keller who suggested that "life is either a daring adventure or nothing at all" and act boldly in pursuit of her dreams.

management of finances, child care, housekeeping and cooking, and shopping. According to Plaintiffs, J.D. will be limited in her ability to perform basic household necessities like those aforementioned. It is the Court's view that J.D. will be somewhat limited to perform certain household-related tasks. The Court finds J.D. should receive 10 percent of the loss Plaintiffs assert she will incur because of household tasks based on the average rate of such services in the United States. (Doc. 25-33 at 10.) The Court has determined loss of household damages just as all other special damages, with the assumption that J.D. has a 25 percent chance of living past 88 years old. As a result, J.D. is entitled to **$985,618** in lost household production damages.

### 2. General Damages

Throughout the course of this case, the Court has been presented with many of the difficulties confronting J.D. as a result of injuries to her left arm. It is clear to the Court from the evidence provided that J.D. is increasingly aware of her limitations. Nevertheless, the Court does not believe she will necessarily be defined by them. J.D. will need assistance, just as all children do, in learning to cope with the challenges she is confronted with. Given J.D.'s disability, finding appropriate activities and teaching J.D. the importance of coping with differences she might have in comparison to her peers is not something the Court fails to take into account. After considering the record as a whole, the Court determines that **$1,500,000** in general damages is appropriate and reasonable in this case.

### 3. Parents' Damages

In addition to those damages owed to J.D., the Court determines that Plaintiffs Brittney Coleman and Gerald Davis, parents of J.D., are entitled to $161,582.70 in past medical expenses and $5,163.29 for expenses related to past medical visits. In addition, the Court also finds that the parents of J.D. should receive $223,240 for future medical care while J.D. is a minor. In total, J.D.'s parents should receive **$389,985.99** to address J.D.'s past and reasonably expected medical expenses while a minor.

While the Court is sympathetic to Brittany Coleman's alleged emotional distress, the Court does not believe Plaintiffs have proven by a preponderance of that evidence that Coleman should receive $1,000,000. Plaintiffs have failed to establish with sufficient

particularity parental emotional distress related solely to J.D.'s condition, although the Court is satisfied that there was some mental distress. Just as the Court is optimistic regarding J.D., the Court is optimistic about Coleman's ability to address any emotional distress she might have over the course of time. As noted by Dr. McCarin, parents deal with a number of anxieties, and the Court is cognizant of that fact. Coleman's general testimony before the Court of severe stress since J.D.'s birth affirms Dr. McCarin's opinion. The Court does not believe $1,000,000 has been established by the evidence to be necessary to address or redress Coleman's personal challenges, but finds that necessary therapy, shown by the evidence, is the best and most appropriate measure of her mental distress damages in view of the evidence in the record. Dr. Lichtblau recommended family/sibling counseling as part of his life care plan. (*See* Doc. 27-1 at 24.) Dr. Lichtblau recommended that the family attend family/sibling counseling one to two times a month up until J.D is 16 years old. (*Id.*) The Court finds upon a preponderance of the evidence that Coleman would benefit from individual counseling once a month for the next five years to address some of the anxieties and distress she faces. Dr. Lichtblau suggests that a counseling session ranges from $70 to $130. (*Id.*) To ensure that Coleman has an adequate opportunity to address the anxiety or stress she has and as damages for mental distress related to J.D.'s condition, the Court hereby finds Coleman is entitled to **$7,800** for individual counseling once a month over the course of five years. This is in addition to family/sibling counseling sessions that are included as part of J.D.'s life plan from now to the age 16.

## IV. CONCLUSION

Having reviewed and considered all the evidence, the Court hereby finds in favor of Plaintiffs and against the United States. J.D. is entitled to **$5,747,251.00** in general and special damages. Brittney Coleman and Gerald Davis are entitled to **$389,985.99** for past and future medical expenses and related costs while J.D. is a minor. Brittney Coleman is entitled to **$7,800** in damages for emotional distress in the form of necessary therapy. Prior to the Court entering final judgment in the above-captioned case, the parties are hereby **ORDERED** to advise the Court as to any special provision necessary with regard to the

disbursement of damages, as found, for J.D. **no later than twenty-one (21) days after entry of this Order**.

      **SO ORDERED**, this 5th day of August, 2016.

                    **/s/ W. Louis Sands**
                    **W. LOUIS SANDS, SR. JUDGE**
                    **UNITED STATES DISTRICT COURT**